IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN HALL, BONITA FRANKS,
VERNON DENNIS, KIM PINDAK,
RONALD PORTIS, WILLIAM
JOHNSON, MCARTHUR HUBBARD, LEO
BEHRENS, NATALIE TROUPE, and
GEORGE GARDNER,

              Plaintiffs,

       v.

CITY OF CHICAGO, A Municipal
Corporation,

           Defendant.

Case No. 12 C 6834

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Motion to Dismiss Plaintiffs' Complaint. For the reasons stated herein, the Court grants the Motion without prejudice.

## I.  BACKGROUND

This civil rights case stems from the Special Order issued on February 23, 2012 ("S04-13-09") by the Chicago Police Department. S04-13-09 is a directive which delineates the responsibilities and procedures for Chicago Police to complete both electronic and hard copy Contact Information Cards. It also outlines the procedures for maintaining and accessing the Chicago Police Department's contact information database.

Plaintiffs are panhandlers in Chicago. They argue that S04-13-09 is unconstitutional because it permits Chicago Police Officers, and in turn the Defendant City of Chicago (hereinafter, the "Defendant" or the "City") to stop Plaintiffs and other individuals without reasonable suspicion. They bring their Complaint on behalf of themselves and others similarly situated.

In the Complaint, Plaintiffs' submit three separate Section 1983 *Monell* claims against the City. Count I alleges that the City's implementation of S04-13-09 violates the Fourth Amendment. Count II alleges that the City is violating the Equal Protection Clause of the Fourteenth Amendment because the City's actions when enforcing S04-13-09 have "a discriminatory effect on individuals who panhandle." Pls.' Comp. at 20. Count III alleges that the City has violated Plaintiffs' First Amendment rights because the City's enforcement of S04-13-09 has a chilling effect on Plaintiffs' free speech rights.

On October 9, 2012, the City filed its Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). In it, the City argues that Plaintiffs' Complaint should be dismissed because the allegations therein fail to state any claims for which relief can be granted.

## II. <u>LEGAL STANDARD</u>

On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts in Plaintiffs' Complaint and draws all inferences in their favor. *Cole v. Milwaukee Area Tech. Coll.*

*Dist.*, 634 F.3d 901, 903 (7th Cir. 2011). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not allege "detailed factual allegations," but must offer more than conclusions or "a formulaic recitation of the elements of the cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Naked assertion[s] devoid of further factual enhancement" will not suffice – a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009).

## III. <u>DISCUSSION</u>

The City claims that Plaintiffs' complaint fails because Plaintiffs' have not pled sufficiently the requirements for municipality liability under *Monell*. Specifically, the City argues that Plaintiffs fail to plead that the City is liable under *Monell* pursuant to an express policy theory and fail to plead that the City is liable under a widespread practice theory.

### A. Monell

Section 1983 provides in relevant part:

Every person who, under the color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

at law, suit in equity or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

"A municipality or other local government may be liable under this section if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978). However, a municipality is not vicariously liable under Section 1983 for its employees' actions. *Monell*, 436 U.S. at 691. Instead, in order to impose Section 1983 liability on a municipality, a plaintiff must prove that "action[s] pursuant to official municipal policy" caused his/her injury. *Id.* at 694. The policy must be the "moving force" behind the allegations surrounding the constitutional violation. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 510 (7th Cir. 1993).

Additionally, in order for a plaintiff to allege municipality liability, the plaintiff must allege that the municipality violated the plaintiff's constitutional rights because the municipality either: "(1) [has] an express policy that, when enforced, causes a constitutional deprivation; (2) [has] a widespread practice that, although not authorized by express municipal policy, is so permanent and well-settled that it amounts to a custom with the force of law"; or (3) [has] caused a constitutional injury by a

person with final policymaking authority. *Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994).

Plaintiffs' *Monell* claims are premised on the first two grounds. First, Plaintiffs claim that the City is liable because S04-13-09 is "constitutionally infirm" in that it serves to promote unlawful seizures. Pls.' Resp. to Def.'s Mot. to Dismiss at 2. Next, Plaintiffs claim that the City is liable under *Monell* because the City knew or should have known that when implementing S04-13-09, law enforcement officers were engaging in widespread unconstitutional practices. The Court will examine each of the Plaintiffs' bases for their *Monell* claims when determining whether dismissal is warranted.

### 1. *Express Policy*

In the Complaint, Plaintiffs argue that the City is liable under *Monell* because S04-13-09 is an express policy that "has led to stops repeatedly being made in the absence of reasonable suspicion." Pls.' Compl. at 19. The City argues that these allegations fail to state a claim because a plain reading of S04-13-09 indicates that it does not authorize nor direct police officers to stop Plaintiffs or any other individuals without reasonable suspicion unless the stop is voluntary.

At the outset, the Court notes that a copy of S04-13-09 is attached to Plaintiffs' Complaint. Because of this, the Court finds S04-13-09 incorporated with Plaintiffs' Complaint and

therefore considers it when ruling on the City's Motion to Dismiss. *See* FED. R. CIV. P. 10(c).

In its Motion, the City assumes without conceding that S04-13-09 is an express policy for the purposes of *Monell*. However, the City asserts that Plaintiffs' express policy claim fails because Plaintiffs' have not pled sufficiently that S04-13-09 caused their alleged constitutional deprivations.

S04-13-09 is a "directive." Pls.' Compl., Ex. 1 at 1. Its stated purpose is to outline the responsibilities and procedures for the Chicago Police Department in maintaining its contact information database and in completing both electronic and hard copy Contact Information Cards. *Id.* Contact Information Cards are cards that a patrol officer fills out while in the field after the officer has a voluntary interaction with an individual or after the officer conducts an investigatory street stop. The Contact Information Cards contain general information concerning the demographics of the person stopped and the circumstances concerning the stop. The information on the Contact Information Cards is then uploaded onto a contact information database maintained by the Chicago Police Department. The database is used to provide the entire Chicago Police Department access to the information on Contact Information Cards and is a tool for maintaining thorough and accurate records.

S04-13-09 provides two distinct categories in which law enforcement officers are permitted or required to complete Contact Information Cards. The first circumstance is a "citizen encounter." *Id.* at 2. S04-13-09 defines a citizen encounter as a "voluntary interaction between a sworn member and a citizen that does not involve any suspicion of criminal activity." *Id.* S04-13-09 instructs that a citizen encounter does not require officers to complete a Contact Information Card, but if the officer determines that the completion of a card will serve "a useful police purpose," then the officer has the discretion to do so. *Id.*

The second circumstance that S04-13-09 pertains to is an investigatory street stop. S04-13-09 defines an investigatory street stop as "[a] contact in which the sworn member has articulable reasonable suspicion that the person is committing, is about to commit, or has committed a crime; consequently, the sworn member has momentarily restricted the person's freedom of movement. The contact should last only as long as necessary to determine if probable cause to arrest exists." *Id.* If an investigatory street stop does not result in an arrest, an officer is required to complete a Contact Information Card to record the encounter. *Id.* If an investigatory street stop does result in an arrest, an officer is not required to complete a Contact Information Card, as the circumstances of the stop and the arrest will be documented in the officer's arrest report. (In response to the City's Motion to

Dismiss, Plaintiffs state that they are only challenging the "citizen encounters" in S04-13-09, not investigatory street stops.) *See* Pls.' Resp. to Def.'s Mot. to Dismiss at 4 n.2.).

As support for their *Monell* claims, Plaintiffs' Complaint provides specific factual allegations for each of the ten individually named Plaintiffs. In the Complaint, each Plaintiff lists a number of dates where they allege they were stopped by a law enforcement officer for a citizen encounter and the officer then completed a Contact Information Card. Some of the Plaintiffs additionally claim that a portion of the aforementioned encounters with law enforcement were unconstitutional because the officer lacked reasonable suspicion or failed to articulate his/her reasonable suspicion. All Plaintiffs claim that during their alleged stops, law enforcement officers did not inform Plaintiffs that the stop was voluntary.

The City argues that Plaintiffs' Fourth Amendment *Monell* claim premised on an express policy theory must be dismissed because S04-13-09 does not govern the substantive bases for officer street stops. Alternatively, the City argues that even if S04-13-09 did govern the substantive bases for street stops, it is constitutional because it requires an officer to have reasonable suspicion prior to conducting an investigatory street stop.

Plaintiffs concede that S04-13-09 does not set forth the "substantive powers" for law enforcement to stop or detain someone,

but argue that Plaintiffs' claims survive dismissal because S04-13-09 permits an officer to fill out a Contact Information Card "in the absence of reasonable suspicion if they believe it will serve a useful police purpose." Pls.' Resp. to Def.'s Mot. to Dismiss at 7. The Court finds Plaintiffs' interpretation of S04-13-09 skewed.

First, Plaintiffs' assertion that S04-13-09 permits officers to stop individuals without reasonable suspicion is taken out of context. S04-13-09 expressly requires officers to have "articulable reasonable suspicion" to conduct an investigatory street stop. Pls.' Compl.; Ex. 1 at 2. Otherwise, S04-13-09 only applies to "citizen encounters" where the interaction between the officer and the individual is "voluntary." *Id.*

Plaintiffs further claim that because S04-13-09 permits law enforcement officers to use their discretion when determining whether or not to complete a Contact Information Card, that this suggests that the citizen encounters are not truly voluntary since an officer has "the power to fill out a Contact Card based solely on their own discretion" without the citizen agreeing to it. Pls.' Resp. to Def.'s Mot. to Dismiss at 5. What Plaintiffs fail to take into account however, is that an officer could engage in a voluntary citizen encounter and the citizen could voluntarily agree to assisting the officer as he completes the Contact Information Card or if the citizen refuses to do so, the officer could simply

complete as much of the Contact Information Card as possible after the citizen leaves. The plain language of S04-13-09 suggests that the drafters of the directive hypothesized these possible scenarios. S04-13-09 reads, "[i]f, at the conclusion of a citizen encounter or investigatory street stop, the citizen is unable or refuses to provide identification . . . the sworn member will: 1. enter "John Doe" or "Jane Doe" as appropriate, in the name field; 2. complete as much of the card as possible; . . ." Pls.' Compl.; Ex. 1 at 3. Plaintiffs imply that because S04-13-09 requires officers to "complete as much of the card as possible" that this somehow transforms a voluntary citizen encounter into a compulsory seizure. *See id.* However, Plaintiffs ignore the language immediately preceding this sentence. Hence, this illustrates that S04-13-09 is not a policy that permits officers to conduct seizures absent reasonable suspicion, unless encounters are voluntary.

Plaintiffs further contend that citizen encounters under S04-13-09 are not voluntary because Contact Information Cards request information obtained from a citizen's Driver's License or State Issued I.D. Plaintiffs allege that a reasonable person would not feel free to leave without their license or I.D. and this therefore makes the interaction involuntary. The Court does not agree. The plain language of S04-13-09 states that if an individual "refuses to provide identification and there is no probable cause to arrest," the law enforcement officer should enter the individual's

name as "John Doe" or "Jane Doe" and "complete as much of the card as possible." *Id.* This demonstrates that S04-13-09 does not require an individual to provide an officer a government issued I.D. if the individual does not wish to do so. Moreover, to the extent that Plaintiffs are arguing that the stops are illegal because an individual may voluntarily provide an officer an identification card and then change his/her mind and wish to leave, the Court does not find such arguments persuasive. The language in S04-13-09 never suggests that an individual is forced to wait until after an officer has completed the Contact Information Cards prior to asking the officer to return their identification card.

Moreover, the Court finds that without more, a circumstance such as this is unlikely to constitute a seizure. *See United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980) (noting that "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . [but] [i]n the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police, cannot as a matter of law, amount to a seizure of that person.").

In addition to this, "the Supreme Court has held repeatedly that police may approach persons and ask questions or seek their permission to search, provided that the officers do not imply that

answers or consent are obligatory." *United States v. Childs*, 277 F.3d 947, 950 (7th Cir. 2002) citing *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984). Indeed, the Supreme Court also holds that "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 498 (1983). Rather, a seizure only occurs when law enforcement officers have "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting from *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

The City points out that as an express policy, S04-13-09 cannot cause Plaintiffs' alleged Fourth Amendment violations because S04-13-09 does not authorize nor direct officers to detain an individual without reasonable suspicion. The Court agrees and as such, finds that Plaintiffs' Fourth Amendment *Monell* claim grounded in an express policy theory fails.

Next, the City argues that Plaintiffs' Equal Protection and First Amendment *Monell* claims premised on express policy theory must be dismissed because S04-13-09 does not target any group of individuals and does nothing to limit an individual's free speech

rights. Plaintiffs respond by clarifying that Counts II and III do not allege that the City has a written policy, but instead "are premised on a "widespread practice" theory of *Monell* liability." Pls.' Resp. to Def.'s Mot. to Dismiss at 12. Thus, the Court will only consider whether Counts II and III of Plaintiffs' Complaint state claims under *Monell* on a widespread practices theory.

### 2. Widespread Practice

Plaintiffs' aver that their Complaint challenges three of the City's widespread policies and/or practices and that a widespread practice theory forms the basis of all three of the Plaintiffs' *Monell* claims against the City. First, Plaintiffs allege that the City's practice of stopping and detaining an individual and requiring them to fill out a Contact Information Card without reasonable suspicion is a violation of the Fourth Amendment. Second, Plaintiffs allege that the City's practice of "systematically falsifying the basis for reasonable suspicion to justify the stops" also violates the Fourth Amendment. Pls.' Compl. at 2-3. Finally, Plaintiffs submit that the City's practice of "routinely" conducting warrant checks unrelated to the initial reason for the stop unnecessarily prolongs the stop. *Id.* at 3. Plaintiffs contend that the City knew about law enforcement conducting unconstitutional seizures because "the practices, policies, and customs . . . are so widespread, permanent and well

settled that they are known to or should be known to the municipal policymakers of the City of Chicago." Pls.' Compl. at 19.

In order for Plaintiffs to state a widespread practice claim under *Monell*, Plaintiffs must allege "facts tending to show that the City policymakers were aware of the behavior of officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). In addition to this, Plaintiffs "must show that the City policymakers were "deliberately indifferent as to [the policy's] known or obvious consequences." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406-07 (1997). The Seventh Circuit defines deliberate indifference in the context of municipality liability under a widespread practice theory to mean "a reasonable policymaker [would] conclude that the plainly obvious consequences of the City's actions would result in the deprivation of a federally protected right." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) citing *Bd. of Cnty. Comm'rs*, 520 U.S. at 411.

> *a. Plaintiffs' Factual Allegations that the City Knew or Should Have Known of the Alleged Unconstitutional Stops*

In their Complaint, Plaintiffs allege that the City knew or should have known that law enforcement officers were illegally stopping Plaintiffs because S04-13-09 requires patrol officers to

submit their Contact Information Cards to supervisory officers. Plaintiffs suggest that the supervisory officer's knowledge is then imputed to the City. The Court disagrees. The Seventh Circuit recently held that a police supervisor is not a final policymaker for the purposes of § 1983 liability. *See Palka v. City of Chicago*, 662 F.3d 428, 435 (7th Cir. 2011) (stating that because the police commander's "decisions were subject to review and implementation by a higher authority, he cannot be a final policymaker for the purposes of municipal § 1983 liability").

Notwithstanding this, Plaintiffs assert their Complaint sufficiently states a widespread practice theory under *Monell* because knowledge can be imputed to the City because of the pervasive nature of the practices at issue. As support for the widespread nature of the alleged unconstitutional practices, Plaintiffs provide statistical data in their Complaint which claims "that unreasonable stops, warrant checks, and questionable justifications for reasonable suspicion have been occurring throughout the City on a regular basis for at least a decade." Pls.' Resp. to Def.'s Mot. to Dismiss at 9.

"Custom and usage by municipal employees and agents may be attributed to a municipality when the duration and frequency of the practices are sufficiently widespread so as to give rise to an inference of actual or constructive knowledge on the part of the municipality." *Allen v. City of Chicago*, 828 F.Supp. 543, 561

- 15 -

(N.D. Ill. 1993). An isolated incident of unconstitutional conduct is insufficient to satisfy the pervasiveness requirement to constitute a widespread practice. *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985).

The City argues that Plaintiffs' data overstates the number of alleged unconstitutional seizures. The City contends that if Plaintiffs' statistical data for the last ten years are broken down annually, then the data would reveal that approximately 21.4 incidents occurred allegedly without reasonable suspicion and this "hardly support[s] a conclusion that a "widespread and pervasive" practice exists that was so systematic and permanent and well-settled that it had the force of law." Def.'s Reply Memo. in Supp. of its Mot. to Dismiss at 9. Given that the Court is required to accept as true all well-pleaded facts in the Plaintiffs' Complaint at the dismissal stage, the Court finds here that Plaintiffs' allegations with respect to the pervasive nature of the alleged constitutional violations is sufficient to establish that the practice was widespread enough to impute constructive knowledge to the City. *See Cole*, 634 F.3d at 903.

### b. Plaintiffs' Allegation that the City Acted Deliberately Indifferent

In their Complaint, Plaintiffs allege that the City acted with a deliberate indifference by "maintaining, overlooking, and preserving the unconstitutional policies, practices and customs" of permitting law enforcement officers to seize individuals without

reasonable suspicion.  Pls.' Compl. at 20.  Plaintiffs further assert that the City's indifference is illustrated in its "(a) failure to adequately train its officers and supervisors that reasonable suspicion is required to effect a Fourth Amendment seizure and/or undertake warrant checks; and (b) to adequately monitor and discipline its officers and supervisors who violate the Fourth Amendment rights of individuals by filling out Contact Cards and/or undertaking warrant checks without reasonable suspicion." *Id.*  The City argues that this is insufficient to establish that the City acted with deliberate indifference.

"It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged*." Bd. of Cnty Comm'rs*, 520 U.S. at 404.  The City claims that Plaintiffs' bald assertion that the City's municipal policymakers acted with deliberate indifference to the rights of the Plaintiffs fails to satisfy the Plaintiffs' pleading requirements.  Plaintiffs respond arguing that deliberate indifference can be "imputed" to the City because of the City's failure to train its officers adequately and because of its failure to monitor and discipline its officers.  Pls.' Resp. to Def.'s Mot. to Dismiss at 12, n.7; Compl. at 20.

A municipality will be held liable under *Monell* for "failure to adequately train or supervise its officers only when the

inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference can be established in one of two ways. "First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation." *Thomas v. Sheahan*, 499 F.Supp.2d 1062, 1095-96 (N.D. Ill. 2007) citing *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir.2003). "Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the officers." *Id.* citing *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). Plaintiffs reference *Sornberger v. City of Knoxville* and *Robles v. Fort Wayne* as support that their pleadings allege sufficiently that the City has acted with deliberate indifference. The Court disagrees.

In *Sornberger v. Knoxville*, the Seventh Circuit reversed a district court's finding that a city could not be held liable on a theory of municipal liability. In making its determination, the Seventh Circuit noted that in order to establish that a municipality is deliberately indifferent for failing to train its

officers under *Monell*, a plaintiff must allege that the municipality's deliberate indifference was in the form of either "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations." *Sornberger*, 434 F.3d at 1029-30.

Plaintiffs here fail to plead that the City failed to provide adequate training to Chicago Police Officers despite "foreseeable consequences," and fail to plead that the City has received repeated complaints of constitutional violations with respect to S04-13-09. Indeed, based on the Court's prior determination that S04-13-09 does not on its face permit officers to conduct compulsory seizures absent reasonable suspicion, the Court cannot see how the City could predict that patrol officers would conduct unconstitutional seizures when enforcing S04-13-09.

Moreover, in *Robles v. Fort Wayne*, the Seventh Circuit held that "there are only "limited circumstances" in which a "failure to train" will be characterized as a municipal policy under section 1983." *Robles*, 113 F.3d at 735 citing *Board of Cnty. Comm'rs*, 520 U.S. at 407. Relying on the Supreme Court precedent, the Court found that the plaintiff failed to establish that the City was aware of the constitutional violations. The Seventh Circuit reasoned "it would be deliberately indifferent if it [the City] failed to provide further training after learning of a pattern of

constitutional violations involving the exercise of police discretion," however, the plaintiff failed to plead that the City was aware of constitutional violations and as such, could not show that the City "was deliberately indifferent to any need for the further training he espouses." *Robles*, 113 F.3d at 736.

The Court finds the same is true here. Plaintiffs fail to make any allegations that the City was aware of a pattern of wrongful conduct involving S04-13-09. While the Court concedes that Plaintiffs' allege that a number of the Contact Information Cards indicate officers were conducting Fourth Amendment seizures without reasonable suspicion, Plaintiffs fail to allege that the City ever received information of constitutional violations and after receiving such information, declined to take any action to correct such violations. *See Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1998) (negligent administration of an otherwise sound program does not support *Monell* liability). Thus, the Court finds that Plaintiffs' *Monell* widespread practice theory claims based on the City's failure to train and failure to monitor adequately and discipline officers fails because the Plaintiffs fail to plead that the City acted with deliberate indifference.

As further support, the Court finds Plaintiffs' other statements within their Complaint persuasive. In the Complaint, Plaintiffs admit that "the legality of an individual stop may not be able to be determined on the basis of a Contact Card alone."

Pl. Compl. at 16, n.1.  Thus, it seems unlikely that the City could act deliberately indifferent to a widespread unconstitutional practice, when the claimed practice may not reveal the alleged constitutional violations.

As such, the Court finds Plaintiffs failed to plead sufficiently that the City has acted deliberately indifferent with respect to an unconstitutional widespread practice in their three *Monell* claims.  The Court therefore, dismisses the entirety of Plaintiffs' Complaint without prejudice.

### III.  <u>CONCLUSION</u>

For the reasons stated herein, the Court grants Defendant's Motion to Dismiss without prejudice.

**IT IS SO ORDERED.**

_____
      Harry D. Leinenweber, Judge
      United States District Court

**DATE:** 12/28/2012