IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN HALL, BONITA FRANKS, VERNON DENNIS, KIM PINDAK, RONALD PORTIS, MCARTHUR HUBBARD, and GEORGE GARDNER,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF CHICAGO, a Municipal Corporation; and Chicago Police Officers BRIAN HANSEN, MICHAEL WALSH, BRAZILIO CYHANIUK, THERESA MAZARIO, LAMONT GIPSON, DOUGLAS HARTZ, WILLIAM SCANLON, RONALD RUFO, JASON PAWLCZYK, MICHAEL WUERTZ, MANNY IRIZARRY, ANGELINA SMITH and UNKNOWN CHICAGO POLICE OFFICERS,<br><br>        Defendants. | Case No. 12 C 6834<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Before the Court are two Motions to Dismiss Plaintiffs' First Amended Complaint. For the reasons stated herein, the Motion to Dismiss brought by the individual Defendants [ECF No. 37] is granted in part and denied in part, and the Motion to Dismiss brought by the City of Chicago [ECF No. 39] is denied.

### I. BACKGROUND

Plaintiffs in this civil rights action are panhandlers in the City of Chicago. They allege that officers of the Chicago Police Department (the "CPD") engage in a pattern of aggressive and

abusive questioning in violation of the Fourth Amendment. They bring suit against the City of Chicago and the individual police officers responsible for the alleged violations (the "Defendant Officers").

The allegations center on a CPD practice whereby officers gather information from citizens and fill out what is known as "Contact Cards." These Contact Cards are used to collect information about those citizens who speak with police in the context of either voluntary "citizen encounters" or non-consensual "investigatory street stops." The information includes the citizen's name, address, sex, race, height, weight, hair and eye color, employer, driver's license number, vehicle make and model, scars, marks, tattoos, possible gang identification, and social security number. CPD directive S04-13-09 requires CPD officers to complete these Contact Cards after all investigatory street stops and any citizen encounters where the officer believes that filling out a Contact Card will serve a useful police purpose.

According to the Complaint, all Plaintiffs panhandle lawfully on public walkways in Chicago. While on the public walkways, all seven Plaintiffs have been stopped and detained on numerous occasions by Defendant Officers for purposes of filling out a Contact Card. In a typical encounter, the officer approaches the subject and asks for his identification. The subject provides his identification, which the officer retains while the information is

- 2 -

transcribed onto a Contact Card. The Defendant Officers never indicate that providing identification is voluntary or that the subject is free to ignore the questions.

The Complaint indicates that while these encounters are similar to each other in many ways, they differ in some respects. Sometimes the Defendant Officers have reasonable suspicion to believe that the citizen is engaged in wrongdoing; other times, the Defendant Officers lack reasonable suspicion. On some but not all occasions the Defendant Officers perform "warrant checks," which involve calling a dispatcher who checks for any outstanding warrants.

Plaintiffs allege that this practice violates their Fourth Amendment right to be free from unreasonable seizures. The Defendant Officers move to dismiss on the ground that Plaintiffs fail to state a Fourth Amendment violation. The City of Chicago moves to dismiss and argues that Plaintiffs fail to state a claim for municipal liability under *Monell v. New York Department of Social Services,* 436 U.S. 658 (1978).

## II. <u>LEGAL STANDARD</u>

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). When ruling on a motion to dismiss brought under Rule 12(b)(6), the Court accepts as true all well-pleaded facts and draws all inferences in favor of the non-moving party. *Cole v.*

*Milwaukee Area Tech. Coll. Dist.,* 634 F.3d 901, 903 (7th Cir. 2011). Plaintiffs need not provide "detailed factual allegations," but they must offer more than mere conclusions or "a formulaic recitation of the elements of the cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

### III.  **ANALYSIS**

#### A.  **Fourth Amendment – Count I**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

#### *1.  Seizure*

Not every interaction between police and citizens involves a "seizure" of the citizen. *See, Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968). A person is seized only "when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas,* 538 U.S. 626, 629 (2003). Courts distinguish between "consensual questioning," in which a citizen is "at liberty to disregard a police officer's request for information," and an "investigative stop," in which a citizen is not free to ignore the police officer and the citizen is seized within the meaning of the Fourth Amendment. *United States v. Black,* 675 F.2d 129, 134-35 (7th Cir. 1982).

- 4 -

Plaintiffs allege that Defendant Officers engage in a practice whereby they approach Plaintiffs, ask for identification, and deprive Plaintiffs of that identification until they have filled out the Contact Card. *See, e.g.,* Am. Compl. ¶¶ 20, 29, 32. Whether a police officer retains a person's driver's license or other documents is a factor in determining whether that person has been seized. *United States v. Borys,* 766 F.2d 304, 310 (7th Cir. 1985) ("Suspects deprived of their identification are effectively deprived of the practical ability to terminate the questioning and leave."). In one case, the Supreme Court held that a citizen was seized when officers took his driver's license, asked him to accompany them to a different location, and retained the license without indicating that he was free to depart. *Florida v. Royer,* 460 U.S. 491, 501-02 (1983). In another, consensual questioning ripened into an investigative stop when one officer informed the citizen that he was conducting an investigation and handed the citizen's driver's license to a second officer. *United States v. Cordell,* 723 F.2d 1283, 1285 (7th Cir. 1983).

However, when the document is returned to the citizen right away, no seizure has taken place. *United States v. Soto-Lopez,* 995 F.2d 694, 698 (7th Cir. 1993). In *Soto-Lopez,* a police officer read aloud the information on the citizen's identification while another officer took notes, and then immediately returned the

identification to the citizen. *Id.* The Court distinguished *Royer* and held that the citizen was not seized. *Id.*

In this case, Plaintiffs have alleged that Defendant Officers held onto their identification and performed warrant checks. Am. Compl. ¶¶ 22, 23. To the extent that police officers retained a citizen's identification while performing a warrant search, that citizen was "seized" within the meaning of the Fourth Amendment. *See, United States v. Tyler,* 512 F.3d 405, 410 (7th Cir. 2008).

Except in situations involving the warrant searches, Plaintiffs have failed to allege that they were seized within the meaning of the Fourth Amendment. There are no allegations that – in situations other than the warrant searches – the Defendant Officers held onto Plaintiffs' identification longer than necessary to complete the Contact Cards. As discussed above, an officer does not effect a "seizure" by asking for identification and writing down that person's information, if the identification is returned promptly. *Soto-Lopez,* 995 F.2d at 698. Plaintiffs do not allege that Defendant Officers applied force, threatened or commanded them, brandished weapons, used an authoritative tone of voice, or blocked them from walking away – the usual hallmarks of a Fourth Amendment seizure. *See, United States v. Drayton,* 536 U.S. 194, 203-04 (2002). In addition, the questioning took place on public walkways in areas known for high foot traffic. Thus, the situation lacked "custodial overtones" that might have made a citizen less

likely to feel free to leave. *See, United States v. Wade,* 400 F.3d 1019, 1022 (7th Cir. 2005).

Plaintiffs' other allegations are insufficient to elevate these encounters into a seizure. Plaintiffs argue that a Contact Card is an official document that creates an air of formality and constitute a display of authority. But it is common for police to write down information provided to them; as far as the Constitution is concerned, the Contact Cards are hardly different than an officer's notepad. As a matter of law, the use of Contact Cards does not transform consensual questioning into an investigative stop.

Plaintiffs argue that the stops were seizures because the questions asked were intrusive and personal rather than routine and mundane. But Plaintiffs cite no authority for that argument, and the Court is not persuaded that consensual questioning becomes an investigative stop once the officer asks about tattoos, birth marks, or even one's social security number. They argue, in addition, that the process of filling out a Contact Card lengthens the questioning. But unless the officer indicates that answering the questions is compulsory, an officer is free to ask a few more questions without effecting a seizure, just as the citizen is free to terminate the interview at any time. *See, United States v. Mendenhall,* 446 U.S. 544, 553 (1980) (explaining that police

officers, like every citizen, enjoy the liberty "to address questions to other persons").

Plaintiffs protest that they were not informed of their right to decline to speak with the police. In this context of consensual questioning, however, the Fourth Amendment does not require police to inform citizens of their right not to answer police questions. *Drayton,* 536 U.S. at 203-04.

Finally, Plaintiffs argue that the Defendant Officers admitted that Plaintiffs were not free to leave until the Defendant Officers finished filling out the Contact Cards. However, a policeman's unarticulated, subjective intentions do not affect the seizure analysis because they cannot lead that citizen to believe that he is not free to leave. *Cf. Berkemer v. McCarty,* 468 U.S. 420, 442 (1984) (explaining that, in the Fifth Amendment context, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation").

To conclude, Plaintiffs have alleged numerous encounters with the police, some (but not all) of which implicate the Fourth Amendment. Plaintiffs have stated a claim that a seizure took place as to those episodes where the Defendant Officers retained a Plaintiff's identification while performing a warrant search. But as to all other encounters with police described in the Complaint,

Plaintiffs fail to allege facts that demonstrate that a Fourth Amendment seizure has taken place. Accordingly, the Motion to Dismiss is granted as to all claims except those based on encounters where the Defendant Officers retained the citizen's identification longer than necessary to complete the Contact Card, such as those situations where a Defendant Officer retained the identification while performing a warrant search.

### 2. Reasonableness

Liability under 42 U.S.C. § 1983 lies only if the seizure is unreasonable. *Brower v. Cnty. of Mayo,* 489 U.S. 593, 599 (1989). As mentioned above, the only seizures alleged properly in the Complaint were the incidents that involved police officers retaining a citizen's identification while performing a warrant search. An investigative seizure such as this is reasonable when it is supported by "reasonable suspicion." *United States v. Tyler*, 512 F.3d 405, 411 (7th Cir. 2008). The seizure must "last no longer than is necessary to effectuate the purposes of the stop," which is to determine whether probable cause exists. *Florida v. Royer,* 460 U.S. 491, 500 (1983).

Plaintiffs have alleged that Defendant Officers lacked reasonable suspicion when they asked Plaintiffs questions, completed Contact Cards, and performed warrant checks. Because the seizure took place only once the Defendant Officer retained the identification after completing the Contact Card, the Defendant

Officers needed to obtain reasonable suspicion sometime before then. If they did, then it is likely the seizure was reasonable. However, if the warrant check dispelled the Defendant Officer's suspicion, and the Defendant Officer continued to interview the citizen and try to complete the Contact Card, then the continued detention could have violated Plaintiffs' rights. That is, even though the process of filling out Contact Cards does affect whether a seizure has taken place, it may bear on whether that seizure was unreasonable in that it lasted longer than necessary to confirm or dispel the Defendant Officer's suspicion.

As to any situations where the Defendant Officers retained a person's identification while performing a warrant search but never obtained reasonable suspicion, Plaintiffs have stated a claim that their Fourth Amendment rights were violated. It is unreasonable for law enforcement to detain someone randomly and arbitrarily (which is the case if there is no reasonable suspicion) for even as short as five minutes while the officer performs a warrant check. *Edmond v. Goldsmith,* 183 F.3d 659, 662 (7th Cir. 1999) (explaining that these sorts of "dragnet searches" must be based on "individualized suspicion of wrongdoing, save in cases of special need based on concerns other than crime detection"). This result is necessary to "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of

individuals." *United States v. Martinez-Fuerte,* 428 U.S. 543, 554 (1976).

The Complaint explains that, in some situations, the Defendant Officers obtained reasonable suspicion at some point before initiating the warrant search. So long as, in those situations, the detention lasted no longer than necessary to confirm or dispel the officer's suspicion, the Motion to Dismiss is granted with respect to those claims.

### 3. *Qualified Immunity*

The Defendant Officers argue that they are protected by qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quotation omitted). Plaintiffs' request for an injunction is unaffected by the qualified immunity doctrine. *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5 (1998) (noting that qualified immunity does not apply in an action "to enjoin future conduct").

As to those claims not dismissed above, Plaintiffs have stated a claim that Defendants violated their Fourth Amendment rights. Supreme Court and Seventh Circuit cases – particularly *Terry v. Ohio,* 392 U.S. 1; *United States v. Borys,* 766 F.2d 304; *United States v. Cordell,* 723 F.2d 1283; and *United States v. Tyler,* 512

- 11 -

F.3d 405 – would have given Defendants reasonable warning that detaining a citizen under the circumstances alleged here would violate the Fourth Amendment. Defendant Officers are not entitled to qualified immunity at this stage.

Plaintiffs state a Fourth Amendment claim where they allege that Defendant Officers, lacking reasonable suspicion, retained their documents longer than necessary to complete a Contact Card, such as while running a warrant check. They also state a claim as to any situations where Defendant Officers had reasonable suspicion but held onto the citizen's identification longer than necessary. As to those claims, the Motion to Dismiss is denied. The Motion to Dismiss is granted as to all other claims against the Defendant Officers, principally those where the Defendant Officer did not perform a warrant check, or those where the Defendant Officer had reasonable suspicion and the stop lasted no longer than necessary.

## B. Municipal Liability – Count II

Plaintiffs' Count II alleges municipal liability based on misconduct undertaken pursuant to official policy and practice. *See, Monell v. N.Y. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). Under *Monell,*

> [a] local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and

- 12 -

well settled; or (3) an official with final policy-making authority.

*Id.* at 690. To survive a Motion to Dismiss, Plaintiffs must "plead factual content that allows the court to draw the reasonable inference that the City maintained a policy, custom, or practice" that led to the constitutional violations. *McCauley v. City of Chicago,* 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation omitted). Because an "unconstitutional act" is a requirement for *Monell* liability, Plaintiffs cannot base their *Monell* claim on any of the encounters that were dismissed above. As with the original Complaint, Plaintiffs' claims are premised on the first two grounds: (1) express policy and (2) unofficial but widespread practice.

### 1. *Express Policy*

Plaintiffs argue that "[t]he City's own written documents . . . endorse the practice of involuntarily detaining individuals to write-up contact cards." Am. Compl. ¶ 103. They say that one such document is CPD Directive S04-13-09, which is attached to and incorporated with the First Amended Complaint. This Court held previously that "S04-13-09 is not a policy that permits officers to conduct seizures absent reasonable suspicion, unless encounters are voluntary." ECF No. 20 at 10. Even though Plaintiffs can amend their Complaint, they cannot change the content of S04-13-09. Thus, the Court declines to reconsider its prior ruling on this issue.

- 13 -

The Court sees it fit to note, in addition, that *Monell* liability lies only for policies of the municipality itself. *Latuszkin v. City of Chicago,* 250 F.3d 502, 505 (7th Cir. 2001). Plaintiffs appear to conflate the CPD and the City of Chicago. *See, e.g.,* Am. Compl. ¶ 5 ("The City acknowledges in its own Special Police Orders. . . ."). But the City of Chicago and the CPD are not the same for purposes of *Monell*. *Latuszkin,* 250 F.3d at 505 ("[Plaintiff's] complaint must be dismissed, however, because he claimed no more than a policy or custom of the CPD. Nowhere did he claim a policy or custom of the City.").

Plaintiffs face precisely the same problem as did the Plaintiff in *Latuskin:* they point not to express policies of the City of Chicago, but to alleged policies of the Chicago Police Department, such as CPD training materials and special orders. Because Plaintiffs have failed to identify any of the City's express policies, their claim cannot proceed as an "express policy" under *Monell*.

### 2. *Widespread Practice*

To state a widespread practice claim under *Monell,* Plaintiffs must allege "facts tending to show that the City policymakers were aware of the behavior of officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior." *Latuszkin v. City of Chicago,* 250 F.3d 502, 505 (7th Cir. 2001). Plaintiffs "must show that the City

- 14 -

policymakers were 'deliberately indifferent' as to [the policy's] known or obvious consequences." *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir. 2002). In this context, "deliberate indifference" means "a reasonable policymaker [would] conclude that the plainly obvious consequences of the City's actions would result in the deprivation of a federally protected right." *Id.*

This Court explained previously that "Plaintiffs' allegations with respect to the pervasive nature of the alleged constitutional violations were sufficient to establish that the practice was widespread enough to impute constructive knowledge to the City." ECF No. 19 at 16. The Court is inclined to renew that holding, especially given the previous lawsuit against the City that concerned unconstitutional use of the Contact Cards, ample publicity about alleged misuse of Contact Cards, and the substantial volume of alleged incidents over a ten-year time period.

To establish deliberate indifference under *Monell,* a plaintiff must allege that the municipality either (1) failed to provide adequate training in light of foreseeable consequences or (2) failed to act in response to repeated complaints of constitutional violations. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029-30 (7th Cir. 2006). Unlike the original Complaint, the Amended Complaint alleges that the City adhered to deficient training practices and materials after it had notice of a pattern

of constitutional violations. Am. Compl. ¶¶ 110, 111. If the City failed to change its training procedures, even when it knew that constitutional violations were occurring and would likely recur, the City can be said to be deliberately indifferent to those violations. Thus, it is plausible that the City could be held liable for its failure to act in response to repeated complaints of constitutional violations.

The City's Motion to Dismiss Plaintiffs' *Monell* claim is denied. However, Plaintiffs' claim is limited to whether the City, because of its knowledge of a pattern of constitutional violations and failure to respond to those violations with new training, was responsible for ensuing constitutional violations.

### IV.  CONCLUSION

For the reasons stated herein, the Motion to Dismiss brought by the Defendant Officers [ECF No. 37] is granted in part and denied in part. The Motion to Dismiss brought by the City of Chicago [ECF No. 39] is denied.

**IT IS SO ORDERED.**

---
Harry D. Leinenweber, Judge
United States District Court

**DATE: 10/30/2013**

- 16 -