**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN HALL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, *et al.*, <br><br> Defendants. | Case No. 12 C 6834 <br><br> Judge Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

The Plaintiffs, seven veteran panhandlers, bring this civil rights action against the City of Chicago, charging that Chicago police officers routinely and systemically violated their Fourth Amendment rights by detaining them during street encounters for the purpose of conducting name checks. A name check searches governmental databases that track such things as driver's license or identification records, outstanding arrest warrants, investigative alerts, criminal history, and missing person requests. The parties have tended to use name checks and warrant search interchangeably, as does the Court. The case was originally brought against the City of Chicago and twelve police officers, but the Plaintiffs have dismissed the latter and are content to proceed against the City pursuant to *Monell v. Department of Social*

*Services of New York,* 436 U.S. 658 (1978).  Consequently, the burden is on the Plaintiffs to prove that a Plaintiff suffered a deprivation of a federal right, either as a result of an express policy, or a widespread practice premised on a failure to train theory endorsed by a final decision maker, and that the policy or practice caused the deprivation of Plaintiffs' rights.  The parties have cross-moved for summary judgment.

## I.  BACKGROUND

On October 30, 2013, the Court granted in part Defendants' Motions to Dismiss, and, for the purposes of the case at this time, limited the Plaintiffs' *Monell* claim to "whether the City, because of its knowledge of a pattern of constitutional violations and failure to respond to those violations with new training, was responsible for ensuing constitutional violations."  The alleged constitutional violations were limited to claims "based on encounters where the Defendant Officers retained the citizen's identification longer than necessary to complete the contact cards, such as those situations where a Defendant Officer retained the identification while performing a warrant search."

In 2003, the Chicago Police Department created the Contact Information System, an investigative tool that authorized officers to document information obtained in the field using paper cards, and from 2011 onward, using electronic contact "cards" inputted

into the Contact Information Database. The contact cards themselves were created in order to document encounters between the police and civilians that did not lead to an arrest. Encounters include consensual encounters, investigatory (Terry) stops, and stops pursuant to the Gang and Narcotics Loitering ordinance. The contact cards are used to collect information about those citizens who speak with police as a result of voluntary citizen encounters or non-consensual investigatory street stops. Information to be elicited includes the citizen's name, address, sex, race, height, weight, hair and eye color, employer, driver's license, vehicle make and model, scars, marks, tattoos, possible gang identification, and social security number. However, a contact card is only used for voluntary encounters if the police officer in the exercise of his discretion believes that filling out the card will serve a useful police purpose. The officer may also at the time the contract card is being filled out run a warrant check to determine whether there are any outstanding warrants against the individual encountered. If the encounter leads to an arrest, an arrest report is prepared in lieu of a contact card. A response to a name or warrants check normally takes seconds, unless the dispatcher is unusually busy responding to other radio traffic.

A Chicago city ordinance prohibits aggressive panhandling. Ordinance 8-4-025, MCC § 8-4-025. The ordinance makes it unlawful for the panhandler to solicit a person who at the time is located within specified locations such as bus stops, in a public transportation vehicle such as a bus, a sidewalk café, a gas station. or within ten feet of an ATM. The ordinance also makes it unlawful to touch a solicited person, to solicit a person who is standing in line while waiting to be admitted to a commercial establishment, to block the path of the person being solicited, to use profane language while soliciting, or to solicit in a group of panhandlers.

**A. The Plaintiffs' Encounters with the Police**

The Plaintiff, John Hall, alleges that he was involved in six (6) encounters with the CPD police officers during the period of February 2011 and February 2013. He alleges that during these stops the officers often performed warrant checks and such encounters would take between five and ten minutes. He does not recall any of the dates of these encounters nor what specifically occurred during the stops. He assumed that the police conducted a warrant check because he generally gave the police his identification when stopped. According to one contract card, an encounter, including a warrant check, resulted from the officer's observation that "subject was appearing faint and affected

negatively by the high temperature weather.  R/O asked if he needed medical attn. subject refused.  Name Check clear." Hall testified, according to his recollections, the police asked for an identification "most of the time" and he would give it to them.  One other encounter identified by Hall occurred on June 4, 2014, when the officer stopped Hall for violation of the Aggressive Panhandling ordinance by "approaching citizens, blocking path on sidewalk demanding USC."  An Administrative Notice of Ordinance Violation ("ANOV") was issued to Hall as a result of this encounter, and a warrant check was carried out.

Plaintiff Kim Pindak alleged that he was involved in at least fifteen encounters with the police during the period in question.  The police conducted warrant checks on at least three of these encounters.  He testified that he had no specific recollection of any of the encounters "because when you're panhandling you deal with thousands of people.  Officers everywhere.  People everywhere."  He only testified to general recollections about what happened and that the police would ask for his identification and keep it "until they're done doing what they're doing."  He estimates that the encounters took from between five and fifteen minutes.  He testified that he didn't feel free to leave during an encounter while the police held his ID card.

Plaintiff George Gardner alleged that he was involved in at least twenty encounters with the police during the period in question. He testified that he had no specific recollection of these encounters. At some of these encounters he was arrested or issued an ANOV. He recalled generally that during these encounters he was asked for his identification and that the police would keep it "until they finish up with you." He estimated that the stops took four or five minutes, but twenty to twenty-four minutes if a ticket was issued, and ten to fifteen minutes if a warrant check was conducted. He testified that he did not feel that he could walk away until the police gave his ID back to him.

Plaintiff Vernon Dennis alleged that he was involved in at least eight encounters with the police during the period in question and that he did not recall specific dates and does not recollect any of the officers. Three of the encounters included warrant checks. Two of these resulted from alleged aggressive panhandling, and the third came about because the officer was investigating whether Dennis matched the description of a theft offender. He recalled two occasions when the officers requested his identification and returned it after conducting a warrant check. One occasion lasted three to seven minutes and the other lasted three to five minutes.

Plaintiff Bonita Franks alleged two encounters with the police but did not claim that these encounters resulted in a warrant check. One of these encounters resulted from a charge of "blocking the sidewalk as she was begging for money."

Plaintiff McArthur Hubbard alleged in the Amended Complaint that the police prepared contract cards and conducted warrant checks on two occasions during the period in question. One of the occasions according to the contact card, Hubbard was stopped for aggressive panhandling, "begging while blocking the sidewalk." He recalled that the officer asked for identification which he gave to him and the encounters lasted between five to seven minutes. He testified that he never felt free to refuse an officer's request for identification, because he didn't want to "disrespect the police and make them mad."

Plaintiff Vernon Dennis had a single encounter with the police documented with a contact card. Officer Richard Hainzl stopped Dennis on Rush Street. The Contact card indicates that Dennis was loitering on the steps of a closed school. A name check was conducted, and it came back "clear." Neither Hainzl nor Dennis recalled anything about the encounter.

## II.  **DISCUSSION**

The parties spent considerable time and paper discussing whether the City's practices and training program established

deliberate indifference to the consequences of the alleged practice of depriving the plaintiffs of their Fourth Amendment right to be free from unreasonable seizures as a result of the City's practice of conducting warrant checks. However, there is no municipal liability under *Monell* if the policy or practice itself did not result in a violation of a plaintiff's constitutional rights. *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010). Although Plaintiffs acknowledge that the police have the right to conduct warrant checks, nevertheless they contend that the constitutional violation, consisting of a seizure, occurs when the police conduct warrant checks that occasionally last more than a few minutes. They cite *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015), as authority for their constitutional claim. However, their conclusion is based on an inaccurate reading of *Rodriguez.*

In *Rodriguez,* a defendant was stopped for a minor traffic violation. The officer in that case had issued a written warning and then concluded all business relating to the traffic stop, which included checking his driver's license, vehicle registration, proof of insurance, and conducting a record check. After returning the documents, the officer asked the defendant for permission to walk his dog around defendant's vehicle, which permission was refused. The officer then instructed the defendant to turn off

the ignition, exit his vehicle, and stand in front of the patrol car, while they awaited the arrival of a backup officer. Approximately seven or eight minutes later, a deputy sheriff arrived on the scene, the officer led his dog twice around defendant's vehicle. Halfway through the second pass, the dog alerted him of the presence of drugs. A search disclosed the presence of a large bag of methamphetamine.

The Supreme Court noted that seven or eight minutes elapsed between the issuance of the written warning until the backup arrived and the dog indicated the presence of drugs. The Court held that, in the absence of reasonable suspicion of a drug crime, the seven or eight-minute detention constituted an unconstitutional seizure. The Court went on to say that:

> [b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop. Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. A 'warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'

*Rodriguez*, at 1615 (Citations omitted). The court remanded the case to the Eighth Circuit to determine whether the dog sniff was supported by reasonable suspicion.

The Court's conclusion that a rather minimal inconvenience of six to eight minutes nevertheless amounted to a Fourth Amendment seizure because the officer was holding the defendant to investigate a possible drug violation, which was a completely separate matter from the reason for the original stop which was a traffic violation. The delay could only be justified if the officer had a reasonable suspicion of a drug crime. On the record before the Supreme Court there was no evidence that the officer had a reasonable suspicion of a drug crime. However, the court did remand the case to the Circuit Court of Appeals to make a determination of whether the officer did in fact have a reasonable suspicion of drug activity.

On the other hand, the Seventh Circuit in *United States v. Sanford*, 806 F.3d 954, 957 (7th Cir. 2015), upheld the constitutionality of a detention against a Fourth Amendment challenge, where an automobile passenger was detained (along with two other occupants of the automobile) after being stopped for a speeding violation, in order to allow a drug-sniffing dog to come to the scene to search for illegal drugs. During the stop, the officer had run a criminal history check on the occupants that

showed a number of previous drug related arrests. During the questioning of the occupants, the officer was given suspicious and inconsistent answers. The total time between the initial stop and the dog alerting of the presence of drugs was 26 or 27 minutes. The Court distinguished *Rodriguez* because the record in that case did not disclose that the officer had reasonable suspicion of possible drug activity at the time the delay was imposed. The Seventh Circuit in Sanford had initially noted that "[t]he trooper checked the occupants' criminal histories on the computer in his car—a procedure permissible even without reasonable suspicion (citations omitted)—indeed a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants."

The record here shows that, on many of the occasions when the named Plaintiffs were detained while a warrant check was carried out, the officers had probable cause to believe that the Plaintiff in question was violating the Aggressive Panhandling Ordinance. If a person is engaged in aggressive panhandling in violation of the ordinance in the presence of a police officer, the officer has the right to arrest the individual, issue him a ticket, an ANOV, or let him go. If the officer has a reasonable suspicion of such an ordinance violation, he has the right to detain the individual in order to investigate the possible violation. Such an

investigation may certainly include a warrant check. In fact, according to the Seventh Circuit in Sanford, a police officer may check criminal histories without a reasonable suspicion which is "a procedure in itself normally reasonable" and takes little time.

In this case, as Plaintiffs admit, they have no clear recollection of the encounters between themselves and the police. None of them testified that the officers had no reasonable suspicion of illegal activity at the time of the encounters. Several of the Plaintiffs testified that they were not even sure of the provisions of the Aggressive Panhandling Ordinance. None of them claimed that he or she believed that the police were harassing him or her by the encounters, although some contended that they did not believe that they were violating the ordinance at the time of the encounter.

Two of the stops complained of, Hall and Gardner, were "wellbeing" checks at which warrant checks were obtained. While neither remembered the encounters, nevertheless, such a minor number of stops falls well short of establishing a pattern or a practice. The wellbeing check on Gardner was carried out during a polar vortex period where the Chicago temperature was extremely cold. The check was done to ensure that the Plaintiff had a place to stay. The wellbeing check on Hall was carried out during an extraordinary hot period.

The Plaintiffs are highly critical of Superintendent McCarthy, who apparently wanted a warrant check after all citizen encounters. This is not exactly his testimony, but he certainly was not opposed to name checks in the discretion of the individual policeman. It may be that McCarthy has a different philosophy concerning police practices. Nevertheless, there are many police departments around the country that follow that practice, obviously contending that this constitutes effective policing. (*See* Expert opinion of Stephen C. Parker, February 9, 2018, *passim*.) There are certainly others who disagree. However, no matter what the philosophy, it does not change the law that warrant checks are constitutional if they don't unreasonably extend the detention. Which brings us to the difficulty faced by Plaintiffs in bringing this *Monell* constitutional claim. The Plaintiffs' theory seems to be based mainly on their belief that Chicago conducts too many warrant checks. Plaintiffs' expert searched 2.7 million contact cards and concluded that warrant checks were noted on 1.6 million cards. (Expert Report of Robert L. Stewart, July 14, 2017, p. 1-3.) The Plaintiffs contend that the City's practice of conducting warrant checks unreasonably prolongs the encounter. However, the number of warrant checks alone does not prove a constitutional violation. The Plaintiffs have failed to prove that a warrant check that unreasonably prolonged an encounter on

any sort of systematic basis so as to constitute a wide spread practice. The Plaintiffs, to put it charitably, had a very incomplete recollection of any of the encounters, as to the purpose of the encounter, whether a warrant check was made, and the length of the encounter.

While Plaintiffs initially sued twelve Chicago officers who had prepared the contact card where a warrant check was conducted, but have since dismissed them, presumably because they believed that Section 1983 constitutional torts would be unprovable. They now proceed only against the City of Chicago on a *Monell* theory. Plaintiffs have the burden of proof that the police violated their Fourth Amendment rights and that they did so as a matter of wide spread practice. While there is some anecdotal evidence that a police officer may have occasionly kept a Plaintiff for as much as 20 minutes, Plaintiffs have failed to show that such encounters occurred on a regular basis and were not based on probable cause or reasonable suspicion of criminal activity, such as violating the Aggressive Panhandling Ordinance. To reiterate, a warrant check alone cannot be equated with an unconstitutional seizure. Certainly, some encounters may have been unduly prolonged as a result of a warrant check, but such minimal evidence as presented here does not equate to a widespread practice of constitutional seizures.

In conclusion, the Plaintiffs have failed to prove that their Fourth Amendment rights were violated on any sort of widespread basis to constitute a Section 1983 *Monell* claim.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Motion for Summary Judgment of the City of Chicago is granted. The Motion for Summary Judgment of the Plaintiffs is denied. Judgment entered in favor of the City of Chicago.

**IT IS SO ORDERED.**

_____
  Harry D. Leinenweber, Judge
  United States District Court

Dated: 2/11/2019